The plaintiff, Rose Mary McDaniel, as the dependent widow of Larry Joe McDaniel, appeals from a summary judgment in favor of the defendant, French Oil Mill Machine Company ("French Oil"), in a wrongful death action alleging liability under the Alabama Extended Manufacturer's Liability Doctrine (AEMLD). We affirm.
Mr. McDaniel worked for Bunge Corporation ("Bunge") in its soybean solvent extraction facility ("the facility") in Decatur, Alabama. He was responsible for lubricating the gears of a rotary soybean conditioner used to toast soybeans. The conditioner is a cylindrical drum, 60 feet long and 15 feet in diameter; it is rotated by two gears turned by a 75-horsepower motor. One gear, a pinion gear, is attached to the motor. It meshes with and turns a ring gear that encircles the drum's exterior. To lubricate these gears, Mr. McDaniel would spread grease on them with a spatula as they turned. On March 11, 1988, while Mr. McDaniel was lubricating the gears, he was pulled into them at the point where the ring and the pinion gears mesh, called the "nip point," and was crushed to death. There were no witnesses to the accident.
Mrs. McDaniel sued French Oil, and several others, under the AEMLD, alleging that French Oil had negligently, wantonly, and defectively designed, manufactured, fabricated, distributed, and assembled the soybean conditioner that caused her husband's death. The trial court entered a summary judgment for French Oil, and Mrs. McDaniel appealed.
"In reviewing the disposition of a motion for summary judgment, we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact" and whether the movant was "entitled to a judgment as a matter of law." Bussey v. John Deere Co., *Page 1148 531 So.2d 860, 862 (Ala. 1988) (citing Chiniche v. Smith,374 So.2d 872 (Ala. 1979)); Rule 56(c) Ala.R.Civ.P. When the movant has carried the burden of making a prima facie showing, by admissible evidence, that there is no genuine issue of material fact and that the movant is entitled to a judgment as a matter of law, the party opposing the summary judgment motion has the burden of presenting substantial evidence creating a genuine issue of material fact. Bass v. SouthTrust Bank of BaldwinCounty, 538 So.2d 794, 797-98 (Ala. 1989); Ala. Code 1975, §12-21-12. "Substantial evidence" is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co.of Florida, 547 So.2d 870, 871 (Ala. 1989); Ogle v.Long, 551 So.2d 914, 915 (Ala. 1989).
Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant, resolving all reasonable doubts against the movant.Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413
(Ala. 1990); Wilson v. Brown, 496 So.2d 756, 758 (Ala. 1986);Harrell v. Reynolds Metals Co., 495 So.2d 1381, 1383
(Ala. 1986).
To establish liability under the AEMLD, the plaintiff must show:
"1) he suffered injury or damages to himself or his property by one who sells a product in a defective condition unreasonably dangerous to the plaintiff as ultimate user or consumer, if
 "(a) the seller is engaged in the business of selling such product, and
 "(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
"2) Showing these elements, the plaintiff has proved a prima facie case although
 "(a) the seller has exercised all possible care in the preparation and sale of his product, and
 "(b) the user or consumer has not bought the product from, or entered into any contractual relation with, the seller."
Casrell v. Altec Industries, Inc., 335 So.2d 128, 132-33
(Ala. 1976); Atkins v. American Motors Corp., 335 So.2d 134, 141
(Ala. 1976).
In 1972, Gold Kist, Inc., hired French Oil to design and supervise the construction of the facility in which Mr. McDaniel was working when he died.[1] French Oil purchased the soybean conditioner for the facility from Superior Welding Company, Inc. ("Superior"). Superior designed, manufactured, fabricated, and assembled the conditioner and shipped it to the facility for installation. French Oil sold the conditioner to Gold Kist under the contract to construct the facility, and French Oil supervised the installation of the conditioner in 1974.
In its motion for a summary judgment, French Oil contended, that it was not liable for Mr. McDaniel's death, because, it said, his death was caused by defects in the conditioner that were created by substantial alterations to it after it had left French Oil's control. The trial court apparently agreed.
The mere fact that a product has been altered subsequent to its sale does not necessarily relieve the seller of liability.Johnson v. Niagara Machine Tool Works, 555 So.2d 88, 91
(Ala. 1989). Instead, the question of a seller's liability under the AEMLD for injuries caused by a defective product altered subsequent to its purchase turns upon whether the defect causing the injury existed in the product as sold or was created by the alteration. Banner Welders, Inc. v. Knighton,425 So.2d 441, 451 (Ala. 1982) (citing Annotation, ProductsLiability: Alteration of Product After It Leaves Hands ofManufacturer or Seller as Affecting Liability forProduct-Caused Harm, 41 A.L.R.3d 1251, 1253 (1972)). When a defect created by an alteration to a product after it left the seller's control is the factual and proximate cause of an injury, and the alteration was not foreseeable, the alteration amounts to an intervening or superseding cause of the injury and relieves the seller from liability under the AEMLD. See *Page 1149 Clarke Industries, Inc. v. Home Indemnity Co., 591 So.2d 458,462 (Ala. 1991) (replacing the disposable dust collection bag on floor sander with a bag not manufactured by the seller was a foreseeable alteration that would not relieve the manufacturer of liability for injuries caused by spontaneous combustion of the dust collection bag attached to the sander); Burkett v.Loma Machine Manufacturing, Inc., 552 So.2d 134, 136 (Ala. 1989) (modifying the blade guard on a billet saw to expose an additional 15 inches of the blade was a substantial change that relieved the manufacturer of liability); Fenley v. RouselleCorp., 531 So.2d 304, 306 (Ala. 1988) (removing the safety devices from a machine press constituted a superseding cause of employee's accident that relieved the press's manufacturer of liability); Williams v. Michelin Tire Co., 496 So.2d 743, 746
(Ala. 1986) (recapping a tire was a substantial alteration that relieved the tire manufacturer of liability); Bullen v. RotoFinishing Systems, 435 So.2d 1256, 1258 (Ala. 1983) (adding a catwalk and platform to an embossing/printing machine did not relieve the manufacturer of liability when there was evidence that the nip point was unsafe as originally designed); BannerWelders, Inc. v. Knighton, 425 So.2d 441, 451 (Ala. 1982) (adding grounding blocks to a shuttle welder would not relieve the welder's manufacturer of liability when the blocks merely increased the frequency of malfunctions); Beloit Corp. v.Harrell, 339 So.2d 992, 996 (Ala. 1976) (removing doctor blades from a paper-making machine would not relieve the manufacturer of the machine of liability when the blades would not have prevented the accident).
Through affidavits, depositions, and photographs, submitted to the trial court with its motion for a summary judgment, French Oil established that when the facility began operating in 1974 a steel mesh screen guarded the nip point of the conditioner's gears to prevent accidents such as the one that caused Mr. McDaniel's death. French Oil and Gold Kist were jointly responsible for providing this screen after the conditioner had been installed at the facility. The screen was manufactured at a local machine shop. Employees from the maintenance department at Gold Kist installed it, and French Oil's employees supervised the installation. The screen was designed so that it could be removed for maintenance, but it could not be removed while the conditioner was operating.
French Oil further established that, when installed, the conditioner had an automatic oil-drip system for lubricating its gears. A light weight oil ran from a cylinder through a copper tube and dripped onto the nip point of the gears. No manual lubrication was required.
After the facility had been operating for approximately one year, Gold Kist altered the conditioner's lubrication system so that it could use a heavier weight of lubricating oil on the gears and thereby reduce the speed at which the conditioner's gears were wearing out. There is no evidence that the gears were wearing out faster than they should have been. Apparently, Gold Kist sought to delay replacing the gears because they were expensive.
When Gold Kist removed the oil-drip lubrication system, it placed a sheet metal trough filled with lubricating oil beneath the pinion gear. It also placed a sheet metal trough beneath the ring gear to catch oil as it dripped off that gear and to route the oil back to the trough beneath the pinion gear. In order to situate the trough beneath the ring gear, Gold Kist permanently removed the steel mesh screen guarding the nip point of the conditioner's gears. It constructed a two-rung, metal pipe barricade, 40 to 45 inches high, around the motor, to serve as a guard. An individual performing maintenance on the conditioner would have to climb over the barricade to reach the motor. Although no safety device ensured that the conditioner would not be operating during maintenance work, the trough beneath the ring gear prevented an individual from having direct contact with the nip point of the gears and, therefore, would have prevented injuries such as the one that caused Mr. McDaniel's death. No manual lubrication was required with the oil-trough lubrication system.
Sometime after Bunge purchased the facility from Gold Kist in 1982, but before 1984, Bunge changed the lubrication system again. *Page 1150 
Bunge's reason for changing was the same as Gold Kist's — to use a heavier lubricant that would further reduce the speed at which the conditioner's gears were wearing out and, thereby, to delay the need to purchase new gears. Bunge removed the oil troughs and began using a lubricating grease that had to be applied manually. Mr. McDaniel used a spatula to apply the grease to the gears while the conditioner was operating. To reach the gears, he could attach a broom handle to his spatula and stand outside the pipe barricade, or he could climb over the barricade and stand within arm's reach of the gears.
According to French Oil's evidence, Mr. McDaniel would not have been pulled into the conditioner's gears if the original steel mesh screen had not been removed, because the nip point of the conditioner's gears would not have been exposed while the conditioner was operating. Also, Mr. McDaniel would not have been in a position to be pulled into the gears if the original automatic oil-drip lubrication system had not been removed, because Mr. McDaniel would have had no need to be lubricating the gears manually. Thus, French Oil made a prima facie showing that the defects created by the alterations to the conditioner after its installation, not any defects existing in the conditioner when it was installed, were the factual and proximate cause of Mr. McDaniel's death.[2]
In her brief, Mrs. McDaniel argues that the summary judgment was improper because, she says, there exists a genuine issue of material fact as to whether French Oil and Gold Kist fulfilled their responsibility to supply a guard for the nip point of the conditioner's gears when the conditioner was installed. In support of her argument, she presented the original affidavits of William Davis and Tommy Raney, employees of Bunge who had worked for Gold Kist in 1974 and 1975. Initially, neither Davis nor Raney recalled the existence of a screen at the nip point in 1974. However, after looking at pictures of the soybean conditioner taken in 1974, both men recalled the screen's existence and amended their affidavits accordingly.
Mrs. McDaniel also presented incomplete testimony from the deposition testimony of Ralph Hutchins, an employee of French Oil who supervised the construction of the facility. Hutchins stated that French Oil and Gold Kist would have been jointly responsible for designing and installing a guard for the nip point of the conditioner's gears, but the portions of his testimony provided do not address whether French Oil and Gold Kist actually supplied such a guard. However, Wayne Ray Pressley, an employee in Gold Kist's maintenance department in 1974, stated specifically in his affidavit that employees from Gold Kist's maintenance department, under the supervision of employees of French Oil, installed the screen at the nip point of the conditioner's gears shortly before the facility began operating.
We conclude that Mrs. McDaniel presented no substantial evidence to rebut French Oil's showing that there were no genuine issues of material fact as to the existence in 1974 of a steel mesh screen guarding the nip point of the gears. Because the presence of the steel mesh screen and the automatic lubrication system would have prevented Mr. McDaniel's accident, we must conclude that the removal of the screen and the change to a manual lubrication system were substantial changes that relieved French Oil from liability. Accordingly, the summary judgment for French Oil is due to be affirmed.
AFFIRMED.
MADDOX, SHORES, HOUSTON and KENNEDY, JJ., concur.
[1] Gold Kist operated the facility until 1982 and then sold it to Bunge.
[2] Mrs. McDaniel does not argue, and there is no evidence, that French Oil could reasonably have foreseen that Gold Kist and Bunge would change the lubrication system, particularly to a manual lubrication system, in order to delay incurring the cost of replacing the conditioner's gears. *Page 1151