Sara Morguson ("Morguson"), as executrix of the estate of Douglas W. Morguson, deceased, filed a wrongful-death action against Druid City Hospital ("DCH"), Phillip Smith ("Smith"), 3M Company f/k/a Minnesota Mining Manufacturing Company ("3M"), and Baxter Healthcare Corporation n/k/a Edward Lifesciences Corporation ("Baxter") arising out of the death of her husband, Douglas Morguson *Page 798 
(hereinafter sometimes referred to as the "decedent"). Morguson, DCH, and Smith entered into a pro tanto settlement for $975,000. Thereafter, the trial court granted 3M's and Baxter's (the remaining defendants) motions for a summary judgment. Morguson appealed. We affirm.
 I. Facts
Mr. Morguson was admitted to DCH to undergo quintuple coronary artery bypass graft and cardiopulmonary bypass surgery, commonly known as "bypass surgery." Because this is open-heart surgery, it requires the use of a heart-lung machine and related equipment; the machine and equipment together are known as a perfusion system and the perfusion system is operated by a medical technician known as a perfusionist. Essentially, the perfusion system consists of a series of pumps and tubes that act as the patient's heart and lungs while the heart is stopped during surgery. The pumps transport blood and medications through the tubes to and from various other pumps, as well as to and from the patient. The pumps used during Mr. Morguson's surgery were manufactured by 3M; the tubes were manufactured by Baxter.
Only one part of the perfusion system is at issue in this case: the left ventricular pump and the left vent tubing. The left ventricular pump operates the left ventricular vent to decompress the heart. The left vent tubing is inserted into the open end of the cannula, a small tube the surgeon places into the left ventricle of the heart. The opposite end of the left vent tubing is connected to a reservoir by the perfusionist. The middle section of the left vent tubing is looped through the inside of the left vent pump. The pump is marked with arrows indicating the direction the blood should flow through the tubing.
The left vent tubing contains a one-way safety valve, a safety device that, when the tube is inserted in the patient, is located approximately 12 inches from the heart. The one-way safety valve ensures that blood and air in the vent tubing flow only away from the heart; it prevents the flow of any blood or air back to the heart. Arrows on the one-way safety valve indicate the direction in which the blood should flow.
Dr. Ferguson was the cardiothoracic surgeon performing Mr. Morguson's bypass surgery, and Smith, a DCH employee, was the assigned perfusionist. Before the surgery, Smith, whose primary responsibility was to operate the heart-lung machine, assembled the perfusion system. In assembling the perfusion system, Smith failed to loop the left vent tubing through the left vent pump correctly; instead, Smith assembled it so that the direction of blood flow through the left vent tubing was toward Mr. Morguson's heart rather than away from it. Pursuant to DCH protocol, after Smith assembled the perfusion system, he was required to perform a "pre-bypass safety checklist" in preparation for Mr. Morguson's surgery. As part of this checklist, Smith was required to determine whether the direction of the vent tubing was correct. Despite this requirement, Smith did not check the tubing direction in the pumps, and he falsified the safety checklist to indicate that he had.
Shortly after Mr. Morguson's surgery began, Dr. Ferguson detected a problem; blood was not coming out of Mr. Morguson's heart and through the left vent tubing even though the left vent pump was on. Dr. Ferguson told Smith to figure out what was causing the problem. Without checking, Smith informed Dr. Ferguson that the tubing direction was correct; it was not.
Based on Smith's falsely reporting that the left vent tubing was installed so that the blood flow was in the correct direction, Dr. Ferguson reasoned that the one-way safety valve was defective and decided to remove it. The left vent pump was stopped and the left vent tubing was disconnected. Because the one-way safety valve was built into the tubing, its removal required the surgical team to cut out that *Page 799 
part of the tubing containing the valve and then splice the tubing. After the one-way safety valve had been removed, the left vent tubing was reconnected and the left vent pump was restarted. At this point, air was pumped into Mr. Morguson's heart; he died 20 days after the surgery.
Dr. Brian Frist, one of Morguson's medical experts, theorized as to the cause of death. According to Dr. Frist, after air was introduced into Mr. Morguson's heart, it migrated through his vascular system and into his brain, creating an air embolus. Once inside the brain, the embolus caused a blockage of the brain's vascular structure. This blockage caused a lack of oxygenated blood to provide nutrients and to remove waste. The brain matter in the area affected by the blockage was unable to perform its function with regard to other bodily functions, such as respiration. The malfunctioning brain led to generalized organ system failure and to Mr. Morguson's death 20 days after the surgery.
3M and Baxter contend that Dr. Frist is not qualified to render an opinion as to the cause of Mr. Morguson's death. In making this argument, 3M and Baxter point to, among other things, the fact that Dr. Frist did not conduct the autopsy on the decedent, that Dr. Frist has no recollection of ever having treated a patient with an air embolus, and that, although he read the autopsy report, Dr. Frist has never directly performed an autopsy where the deceased was suspected of having had an air embolus in the brain. Moreover, 3M and Baxter note, the autopsy report does not mention an air embolus as being related to the cause of death; rather, the stated cause of death was multi-organ system failure caused by infection. However, it is not necessary for us to resolve any dispute as to cause of death because the judgment in this action must be affirmed even if we assume, for the sake of argument, that air was introduced into Mr. Morguson's heart during surgery and that that air created an embolus, which we do.
Morguson alleged that 3M and Baxter were liable for the decedent's death under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD") because, she argues, the perfusion pump, which was manufactured by 3M, and the left vent tubing, which was manufactured by Baxter, were defective. Specifically, Morguson alleged that the pump and the tubing were unreasonably dangerous because the designs of both were defective and that the warnings provided with the tubing were inadequate. Both 3M and Baxter moved for a summary judgment, and the trial court granted those motions. This appeal involves only the product-liability claims Morguson asserted against 3M and Baxter.
In Kirk v. Garrett Ford Tractor, Inc., 650 So.2d 865, 866 (Ala. 1994), this Court stated our standard of reviewing a summary judgment in the context of a products-liability action:
 "The standard of reviewing a summary judgment is the same as the standard for granting the motion; we must determine whether there was a genuine issue of material fact, and, if not, whether the movant was entitled to a judgment as a matter of law. Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and resolve all reasonable doubts against the movant. Wilson v. Brown, 496 So.2d 756, 758 (Ala. 1986); Harrell v. Reynolds Metals Co., 495 So.2d 1381
(Ala. 1986). See also Hanners v. Balfour Guthrie, Inc., 564 So.2d 412 (Ala. 1990).
 "Under the substantial evidence rule the nonmovant, in order to defeat a properly supported summary judgment motion, must present `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871
(Ala. 1989). *Page 800 
 "This Court has stated the elements of a claim under the AEMLD:
"`"To establish liability, a plaintiff must show:
 "`"(1) he suffered injury or damages to himself or his property by one who sells a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer, if
 "`"(a) the seller is engaged in the business of selling such a product, and
 "`"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it [was] sold."'
 "Yamaha Motor Co. v. Thornton, 579 So.2d 619, 621
(Ala. 1991) (quoting Casrell v. Altec Indus., Inc., 335 So.2d 128, 132-33 (Ala. 1976))."
The plaintiff has the burden of presenting substantial evidence of proximate cause. Hicks v. Vulcan Eng'g Co., 749 So.2d 417, 424 (Ala. 1999). "Proximate cause is an act or omission that in a natural and continuous sequence, unbroken by any new and independent causes, produces an injury or harm and without which the injury or harm would not occur."Dillard v. Pittway Corp., 719 So.2d 188, 192 (Ala. 1998) (citing Thetfordv. City of Clanton, 605 So.2d 835 (Ala. 1992)).
 II. Issues on Appeal
Morguson raises four issues on appeal. First, Morguson argues that 3M and Baxter failed to prove that an intervening or superseding cause occurred that absolved them from liability. Second, Morguson argues that Baxter was not entitled to a summary judgment as to the failure-to-warn claim. Third, Morguson argues that she proffered evidence establishing the existence of safer, practical, alternative designs of the perfusion pump and vent tubing. Finally, Morguson argues that Dr. Brian Frist, one of her expert witnesses, was qualified to express opinions that would support a factual finding that the cause of the decedent's death was an air embolus.
Morguson argues that the errors, omissions, and misrepresentations made by Smith and Dr. Ferguson during the decedent's surgery were not independent and superseding causes that broke the causal chain between the allegedly defective left vent pump and left vent tubing and the decedent's death. We disagree.
It is Morguson's burden to present substantial evidence creating a genuine issue of material fact as to whether the left vent pump and left vent tubing were defective and unreasonably dangerous when the products were sold and whether their defective condition was the proximate cause of the decedent's death. See Kirk, 650 So.2d at 866. The cornerstone of proximate cause is foreseeability. Dillard, 719 So.2d at 192 (citingGeneral Motors Corp. v. Edwards, 482 So.2d 1176 (Ala. 1985)). In the present case, the actions taken by Smith and the surgical team during the surgery were not foreseeable by 3M and Baxter.
In assembling the perfusion system before Mr. Morguson's surgery, Smith improperly threaded the left vent tubing through the left vent pump, despite the fact that the inflow and outflow ports of the pumps are marked with arrows indicating the correct directional flow. This improper threading caused the flow through the vent tubing to be directed toward Mr. Morguson's heart, rather than away from it. Smith then failed to follow DCH protocol by not verifying the vent tubing direction during the pre-bypass safety checklist; rather than confirm that the perfusion system was set up correctly *Page 801 
Smith falsified the checklist to indicate that he had. Next, after Dr. Ferguson noticed that blood was not flowing out of Mr. Morguson's heart and asked Smith to check the left vent pump and the left vent tubing, Smith again misrepresented that they were set up correctly. Finally, the surgical staff removed the one-way safety valve in the left vent tubing. All of Morguson's experts agree that had the one-way safety valve been in place, air could not have gone to Mr. Morguson's heart.
It may have been foreseeable that a perfusionist would improperly assemble the perfusion system (which is precisely why the pre-bypass safety checklist exists). However, it is clearly not foreseeable 1) that the perfusionist would not check the vent tubing direction during the pre-bypass safety checklist; 2) that the perfusionist would falsify the safety checklist to state that he had checked the direction of the vent tubing; 3) that the perfusionist would lie to the surgeon about having checked the direction of the vent tubing after being asked directly to do so; and 4) that the surgical team would cut the one-way safety valve out of the vent tubing.
Additionally, when the surgical team removed the one-way safety valve from the vent tubing, it made a material alteration to the vent tubing. This Court has held that
 "[w]hen a defect created by an alteration to a product after it left the seller's control is the factual and proximate cause of an injury, and the alteration was not foreseeable, the alteration amounts to an intervening and superseding cause of the injury and relieves the seller from liability under the AEMLD."
Kirk, 650 So.2d at 867 (holding that the removal of a protective shield from an auger was a substantial change that relieved the seller from liability for injuries caused when the worker's leg became entangled in the auger). See also McDaniel v. French Oil Mill Mach. Co., 623 So.2d 1146
(Ala. 1993) (holding that the removal of a steel mesh screen that guarded gears of a rotary soybean conditioner and the machine's change from automatic lubricating to manual lubricating were substantial changes that relieved the seller of liability for the worker's death where the worker was crushed by the gears); Burkett v. Loma Mach. Mfg., Inc., 552 So.2d 134
(Ala. 1989) (holding that modifying the blade guard on a billet saw to expose an additional 15 inches of the blade was a substantial change that relieved the manufacturer of liability for injuries to the operator of the saw); Fenley v. Rouselle Corp., 531 So.2d 304 (Ala. 1988) (holding that removing the safety devices from a machine press constituted a superseding cause of the employee's accident that relieved the press manufacturer of liability).
Therefore, we hold that the trial court's summary judgment on this issue was correct because the actions of Smith and the surgical team were not foreseeable and the removal of the one-way safety valve amounted to an intervening and superseding cause that broke any causal chain between the manufacture of the perfusion system and Mr. Morguson's death.
The next issue raised by Morguson pertains to the adequacy of the warnings and instructions provided by Baxter with the vent tubing. Pursuant to the learned-intermediary doctrine,[1] Baxter had no duty to provide warnings to Mr. Morguson; *Page 802 
rather, Baxter's duty was to warn the physicians and perfusionists at DCH who used the vent tubing. See Toole v. McClintock, 999 F.2d 1430 (11th Cir. 1993); Stone v. Smith, Kline French Labs., 447 So.2d 1301
(Ala. 1984) (adopting reasoning of Reyes v. Wyeth Labs., 498 F.2d 1264
(5th Cir. 1974)). Morguson argues that Baxter's warnings to the physicians and perfusionists who would be using the vent tubing were not adequate. We disagree.
The vent tubing sold to DCH by Baxter contained a package insert that enumerated several cautions and instructions. One of the cautions emphasized the importance of using trained personnel to set up the perfusion system: "Caution: This device must be set up and operated by personnel trained in the use of cardiopulmonary devices." Another caution emphasized the importance of the one-way safety valve in preventing an air embolus:
 "Caution: The use of safety/warning devices such as level sensors, bubble devices, arterial filters, positive and negative pressure relief valves, one-way valves and prebypass filters is recommended to minimize the occurrence of gaseous or particulate emboli passing to the patient."
(Emphasis added.) Finally, an instruction effectively warned the medical staff not to remove the one-way safety valve:
 "CustomPac Products are manufactured in accordance with customer specifications for assembly of medical devices and tubing configurations. Any change resulting from these specifications and/or any deviation from standard extracorporeal procedure which could compromise the function of these products is the responsibility of the customer."
(Emphasis added.)
When a warning is given by the manufacturer, the manufacturer may reasonably assume that it will be heeded by the consumer. Ex parteChevron Chem. Co., 720 So.2d 922, 927 (Ala. 1998) (citing Restatement(Second) of Torts § 420A cmt. j (1965)). The warnings given by Baxter in this case cautioned against the exact acts and errors committed by DCH employees. Therefore, we hold that Morguson's failure-to-warn claim must fail.
The third issue Morguson raises is that the perfusion pump and the vent tubing were defectively designed. Morguson contends that her expert witnesses proffered alternative designs of the perfusion pump and vent tubing that would have prevented Mr. Morguson's death by eliminating the danger of human error. However, we previously stated that 3M and Baxter were relieved from liability because the actions of Smith and the surgical team, which were unforeseeable, and because the surgical team's removal of the one-way safety valve amounted to an intervening and superseding cause that broke the causal chain. Therefore, this issue is without merit.
The final issue raised by Morguson concerns whether Dr. Frist was qualified to give an expert opinion as to the cause of Mr. Morguson's death. Because throughout this opinion we have assumed that air was introduced into Mr. Morguson's heart during surgery, and because even after making that assumption we find all of Morguson's arguments to be without merit, determining whether Dr. Frist is qualified as an expert witness would serve no purpose. Therefore, we decline to do so.
In conclusion, we hold that Morguson failed to present substantial evidence to rebut 3M's and Baxter's showing that there were no genuine issues of material facts and that 3M and Baxter were entitled to judgments as a matter of law as to *Page 803 
Morguson's claims. Accordingly, the summary judgments for 3M and Baxter are affirmed.
AFFIRMED.
LYONS and WOODALL, JJ., concur.
MOORE, C.J., and JOHNSTONE, J., concur in the result.
[1] Courts rely on the expertise of physician intermediaries to "bridge the gap" in cases where the medical product and its related warning are too complex to be fully appreciated by the patient. Toole v. BaxterHealthcare Corp., 235 F.3d 1307, 1314 (11th Cir. 2000).