[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-10897

_____

D.C. Docket No. 1:14-cv-00605-VEH

GLORIA RODGERS, as personal
Representative of the Estate of John
Rodgers, Deceased,

Plaintiff - Appellant,

versus

AWB INDUSTRIES, INC. D/B/A/
AIRCRAFT TOOL SUPPLY
COMPANY,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(February 21, 2019)

**ON PETITION FOR REHEARING**

Before WILLIAM PRYOR, MARTIN, and BALDOCK,* Circuit Judges.

BALDOCK, Circuit Judge:

Appellee's petition for panel rehearing is GRANTED in part and DENIED in part. We VACATE our prior opinion in this case, issued on January 16, 2019, and substitute the following opinion in its place.

While performing maintenance on an aircraft, John Rodgers was struck in the head by the aircraft propeller and died days later.  His wife, Plaintiff Gloria Rodgers, subsequently sued Defendant AWB Industries, Inc., d/b/a Aircraft Tool Supply Company ("AWB"), the manufacturer of a tool Rodgers used that day to perform a maintenance test.  Plaintiff alleged a violation of the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"), breach of warranty, and negligence or wantonness.  Defendant filed a motion for summary judgment, and the district court granted this motion, holding Plaintiff's theory of proximate causation was too speculative.  Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we reverse and remand for further proceedings.

I.

The following are the facts viewed in the light most favorable to Plaintiff. *See Castleberry v. Goldome Credit Corp.*, 408 F.3d 773, 785 (11th Cir. 2005).

---

* Honorable Bobby R. Baldock, United States Circuit Judge for the Tenth Circuit, sitting by designation.

*A. Differential Pressure Tester*

The product at issue in this case is AWB's Model 2E-M Differential Pressure Tester ("Tester"), which is used to conduct differential pressure tests, also called compression tests, on engine cylinders. These tests "assess the internal condition of cylinders and cylinder components on piston engine aircraft" and must be performed on most aircraft once per year pursuant to Federal Aviation Administration ("FAA") regulations. Doc. 13 at 3. Essentially, a mechanic introduces a known quantity of compressed air, regulated via the Tester, into an engine cylinder. A gauge on the Tester displays the amount of compression the cylinder maintains, thereby revealing the cylinder's air leakage rate. Excessive loss of compression in an engine cylinder could indicate problems within the cylinder and may lead to engine failure.

AWB's Tester has an air inlet, which has a standard ¼-inch male compressed air coupling.[1] This air inlet is on the bottom-left side of the Tester below the left gauge, as shown in the photograph below. A compressed air hose, which has a standard ¼-inch female coupling, connects to this air inlet coupling. The Tester contains a mechanism that regulates air so that when high-pressure, unregulated air enters the device from the compressed air hose, a regulated flow of air flows out of the Tester. The regulated air leaves the Tester though an output

---

[1] A coupling is the part of one tool that connects to another tool.

3

hose, which has a ¼-inch female coupling that connects to the cylinder via an adapter plug.



Doc. 45-1 at 5.

Often, to create more space to perform the compression test, a compression tester extension ("Extender") is used with the Tester.  The Extender contains no air-regulating mechanism and does not perform any function apart from the Tester. When an Extender is used, the Tester is not connected directly to the cylinder. Instead, the Extender attaches to the cylinder.  The Tester's hose then attaches to the Extender's ¼-inch male coupling (coupling in the top-right of photograph below).  Because the Extender does not perform any function apart from the Tester, the size of the Tester hose's coupling necessarily determines the size of the Extender's input coupling.

4



Op. Br. at 9.

In accordance with AWB's Tester instructions, a mechanic performs a compression test as follows. First, the mechanic removes one spark plug from each cylinder. Doc. 48-2 at 34. Second, the mechanic rotates the propeller, which is approximately ten to twelve inches from the front of the cylinder, "until the piston of the cylinder being tested begins its compression stroke."[2] *Id.* Viewing the evidence in the record in Plaintiff's favor, it appears the compression stroke begins after bottom center. Doc. 73-1 at 2. Third, the mechanic installs an adapter plug—or in this case, the Extender—into the spark plug hole. Doc. 48-2 at 34. Fourth, the mechanic attaches the Tester hose to the Extender. *Id.* Fifth, with the Tester's air regulator off, the mechanic attaches an air source of at least 90 psi (i.e.,

---

[2] All the reader possibly needs to know about a piston is that (1) something called a piston exists in each cylinder of a "piston engine"; (2) the piston cycles through four strokes, the first one being a "compression stroke," to create power for the engine; and (3) when the piston is in the "top dead center" or "bottom dead center" position and air is introduced into the cylinder, the propeller will not move.

5

the compressed air hose) to the Tester's air inlet.  *Id.*  Sixth, the mechanic opens

the fill valve and adjusts the regulator until the cylinder gauge reads 10–20 psi.  *Id.*

Seventh, the mechanic rotates the propeller until the piston reaches the top dead

center location.  *Id.*  Eighth, the mechanic adjusts the regulator until the regulator

gauge reads 80 psi.  *Id.*  AWB's instructions contain a note at this step: "***NOTE: At***

***this stage, enough pressure will build up in the cylinder to force the piston down***

***from the [top dead center] position; therefore it is recommended that someone***

***hold the prop to prevent rotation.***"  *Id.*  Lastly, the mechanic compares the

readings on the two gauges, which reveal the cylinder's compression loss.  *Id.*

### B. The July 19, 2012 Incident

John Rodgers was an experienced pilot and aircraft mechanic who worked

on non-commercial aircraft.  At the time of the incident, he worked as, among

other things, a self-employed mechanic at Anniston Regional Airport.  On July 19,

2012, Scott Wallace and Rodney Findley, employees of a company that leased

hangar space to Rodgers, saw Rodgers pushing a Darter aircraft into the hangar.

Wallace and Findley helped Rodgers push the aircraft the remaining distance into

the hangar.  Rodgers voiced frustration with the aircraft and told Wallace and

Findley that he needed to perform a compression test on the engine for the third

time.  Rodgers asked Findley if he would help take the cowling off the aircraft, and

Findley did so.[3]  Wallace and Findley stood by, waiting to help Rodgers again after he finished performing the test.

The aircraft had a four-cylinder Lycoming engine.  Rodgers proceeded to perform compression tests, using the Tester, on the two cylinders located on the right side of the engine.[4]  He marked the test results on the cylinders.  Findley reported that, after completing compression tests on both right cylinders, Rodgers pushed the air hose under the airplane and walked around to the left side of the engine.  At this point, Wallace was standing approximately two feet in front of the aircraft nose, and Findley was standing by the right side of the aircraft next to the engine.  Wallace later recalled, "at that time it looked like [Rodgers] was starting to hook up and get everything ready for the compression check[.]"  Doc. 48-4 at 7.  Rodgers removed the spark plugs from both left cylinders and connected a McFarlane Extender to the spark plug hole on the left-front cylinder.  Neither Wallace nor Findley saw exactly what Rodgers did next.

All of a sudden, the propeller rotated quickly and forcefully.  The engine did not make a combustion sound when this rotation occurred.  Findley felt a "quick gust of wind" and looked up to see that Rodgers had a gash on his head.  Doc. 48-7 at 6.  Findley screamed out to Rodgers.  Wallace saw that a propeller blade had

---

[3] The cowling is the sheet of metal on the nose of the plane that covers the engine.
[4] All references to the "right" or "left" side of the engine will be explained from the perspective of the pilot in the cockpit.

7

rotated, struck Rodgers in the left side of the head and chest, and stopped. Rodgers fell to the ground and was unresponsive. He was taken to the hospital with an open skull fracture and died days later.

Pictures of the scene reveal the location of the relevant tools immediately after the propeller blade struck Rodgers. The Extender was connected to the left-front cylinder. The Tester was sitting on top of the left side of the engine, not connected to anything. The air hose was lying on the hangar floor next to the left side of the engine. It is undisputed that "Rodgers attempted to connect the shop air hose to the McFarlane extender which introduced unregulated compressed air into the [left-front] cylinder causing the propeller to rotate." Doc. 48-11 at 17. It is further undisputed that there is no formal procedure that requires connecting a compressed air hose directly to an engine cylinder. Doc. 48-10 at 21 (AWB's expert Matthew Lykins acknowledging there is no written endorsement for connecting high-pressure air directly to a cylinder).

### C. District Court Proceedings

Plaintiff's theory of the case is that Rodgers grabbed the air hose, *mistakenly thinking it was the Tester hose*, and momentarily connected it to the Extender. The connection of the air hose to the Extender caused compressed air to be inserted directly into the cylinder, thereby causing the propeller to rotate at great force. Had it not been possible for the air hose to connect with the Extender—that is, had

8

the couplings on the air hose and Extender not been compatible—this accident could not have occurred. Because the Tester's output coupling size necessarily dictates the size of the input coupling on the Extender, according to Plaintiff, the size of the Tester's output coupling caused Rodgers's injury.

Proceeding under this theory, Plaintiff filed suit against AWB, alleging a violation of the AEMLD, breach of warranty, and negligence or wantonness.[5] Plaintiff proffered two expert witnesses: Dr. Michael Maddox and John Goglia. Dr. Maddox, a Certified Human Factors Professional, produced an expert report offering the following opinions: (1) Rodgers "unintentionally connected a high-pressure air source directly into the cylinder of the engine he was testing"; (2) AWB failed to conduct a human error analysis to identify the most likely human errors made while using the Tester; (3) the Tester's design made Rodgers's error more likely to occur; (4) the Tester's design "violate[s] long-standing guidelines for the design of such equipment"; and (5) an alternative design of the Tester that would eliminate the potential for the error Rodgers made exists. Doc. 49-7 at 8–13.

Goglia, an aviation mechanic expert, was "tasked to review whether an alternative design for the coupling for the compression test extender used in the

---

[5] Plaintiff's complaint also named McFarlane Aviation, Inc., the Extender's manufacturer, as a defendant. McFarlane, however, entered into a settlement agreement with Plaintiff and is not a party to this appeal.

ATS Pro Differential Pressure Tester Kit would be a practical and safer alternative." Doc. 49-8 at 4. Specifically, Plaintiff's proposed alternative design consists of changing the Tester's ¼-inch female output coupling to a ¾-inch female output coupling. Because the Tester's output coupling size dictates the Extender's male input coupling size, the Extender's input coupling would necessarily have to change to ¾-inch to be compatible with the Tester's output coupling. This change would preclude the possibility of connecting the air hose to the Extender. Goglia tested this alternative design on four different engines and reported that "it worked perfectly." Doc. 48-12 at 17. Goglia concluded "this alternative design change is not only safer than the subject design, but is also practical." Doc. 49-8 at 4.

AWB produced an expert report by Matthew Lykins. Lykins ultimately concluded Rodgers failed to secure the propeller while conducting the test and failed to stay clear of the propeller's arc. Doc. 48-11 at 24. Had Rodgers not committed these errors, his injury would have been prevented. *Id.* Further, Lykins opined Plaintiff's proposed alternative design limits the use of the Tester by making it incompatible with other adapters and extensions, fails to eliminate the error committed by Rodgers, encourages mechanics to modify the Tester themselves, and compromises aviation safety. *Id.* Notably, in his report, Lykins stated, "the undisputed theory is that Rodgers attempted to connect the shop air

10

hose to the McFarlane extender which introduced unregulated compressed air into the [left-front] cylinder causing the propeller to rotate." *Id.* at 17.

After discovery, AWB filed a motion for summary judgment. In this motion, AWB raised the affirmative defenses of contributory negligence, assumption of risk, and product misuse. Additionally, AWB argued there was no evidence the Tester was the proximate cause of Rodgers's injuries and Plaintiff's theory relied upon speculation and conjecture. Lastly, AWB argued there was no evidence to support Plaintiff's breach of warranty or wantonness claims. After Plaintiff responded and AWB replied, the court set a hearing on the motion.

On July 21, 2016, two weeks before the hearing, AWB filed a motion to preclude Plaintiff's expert witnesses. The next day, before Plaintiff could respond, the district court denied the motion to preclude Plaintiff's expert witnesses as untimely. The district court reasoned:

> Because this Motion, if granted, would totally dispose of Plaintiff's product liability claims against AWB, to the extent that it seeks to have the court not allow these experts' testimony and opinions to be considered <u>at summary judgment</u>, it is untimely filed under the parties' most recent dispositive motion deadline, which expired on March 31, 2016.

Doc. 64 at 2. The court also noted that "if AWB's Motion for Summary Judgment (Doc. 45) is denied and this case is set for a trial, AWB may refile its Motion as a motion in limine, which the court will consider (after briefing) under the court's

11

standard pretrial order process." *Id.* No other briefing was taken on the admissibility of Plaintiff's experts.

After the hearing, the district court granted Defendant's motion for summary judgment on all claims in a written opinion. As set forth in more detail below, the court held Plaintiff's theory, including her expert witnesses' opinions in support, was too speculative. Thus, Plaintiff could not establish proximate causation. Plaintiff timely appealed, arguing the district court erred by (1) granting summary judgment based on a lack of proximate cause; and (2) refusing to consider the causation testimony of Plaintiff's expert witnesses.

## II.

"We review the district court's ruling on a motion for summary judgment *de novo*, applying the same legal standards that bound the district court." *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1191 (11th Cir. 2010) (citing *Nat'l Fire Ins. Co. of Hartford v. Fortune Constr. Co.*, 320 F.3d 1260, 1267 (11th Cir. 2003)). Summary judgment is appropriate only "when the pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.* (citing Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). We "view all evidence and factual inferences

12

reasonably drawn from the evidence in the light most favorable to the nonmoving

party"—here, Plaintiff.  *Castleberry*, 408 F.3d at 785.

The district court's order granting Defendant's motion for summary

judgment on all claims held Plaintiff had not produced enough evidence of

proximate causation—an element common to all of Plaintiff's claims.  The district

court's analysis of proximate causation reads in full:

> Plaintiff's claim . . . is that John Rodgers was injured by the Tester's defective design in that John Rodgers thought he was connecting the Tester — rather than the Extender (which was already connected to the airplane engine cylinder) — to the air compressor hose, and that, if the Tester had been designed differently, he would not have been able to make that mistake.  However, no one knows what John Rodgers was thinking when he connected one end of the Extender to the airplane cylinder and the other end to the air compressor hose.  A jury would have to speculate that, despite his years of experience, he confused the Extender with the Tester.  Further, it is undisputed that, if the <u>Extender</u> or the <u>air compressor hose</u> had been manufactured so that <u>they</u> were not compatible with each other, the accident could not have occurred.  Therefore, Plaintiff has failed to present evidence that any aspect of the design of the Tester or the warnings accompanying it proximately caused the accident that injured John Rodgers.

Doc. 75 at 11–12.  The district court also, in a footnote, held Plaintiff's "expert

opinions cannot establish proximate causation here, because they are based on

speculation."  *Id.* at 12 n.5.

As the attentive reader recognizes, the district court's description of

Plaintiff's claim is plainly inaccurate.  Plaintiff's claim is that Rodgers thought he

was connecting the Tester—rather than the *air compressor hose*—to the *Extender*.

That is, he accidently grabbed the air compressor hose instead of the Tester hose. The remainder of the district court's analysis does not make sense in light of Plaintiff's actual claim.  For example, to accept Plaintiff's claim, a jury most assuredly would not have "to speculate that, despite his years of experience, [Rodgers] confused the Extender with the Tester."  Additionally, given the size of the Tester's output coupling dictates the size of the Extender's input coupling, we are unsure what the district court's point was in noting "if the Extender or the air compressor hose had been manufactured so that they were not compatible with each other, the accident could not have occurred."

We will assume, for the sake of the following analysis, that the district court understood Plaintiff's claim and held, as Defendant argued, it was too speculative to conclude Plaintiff accidentally grabbed the *air hose* instead of the *Tester* and attached it to the cylinder.  We will also assume that this was the district court's basis for holding Plaintiff's expert opinions were too speculative.

We turn to Alabama law on speculation—a place the district court did not bother to venture despite holding Plaintiff's theory was too speculative. Speculative testimony or conjecture cannot serve as the basis for proximate cause. *See Ex parte Mobile Power & Light Co.*, 810 So. 2d 756, 760–61 (Ala. 2001). "[A] conjecture is simply an explanation consistent with known facts or conditions but not deducible from them as a reasonable inference."  *Id.* at 760 (citing *Ex parte*

14

*Diversey Corp.*, 742 So. 2d 1250, 1254 (Ala. 1999)). "Proof which goes no further than to show an injury could have occurred in an alleged way, does not warrant the conclusion that it did so occur, where from the same proof the injury can with equal probability be attributed to some other cause." *Id.* (citing *Ex parte Diversey Corp.*, 742 So. 2d at 1254). But "*if there is evidence which points to any one theory of causation, indicating a logical sequence of cause and effect, then there is a juridical basis for such a determination,* notwithstanding the existence of other plausible theories with or without support in the evidence." *Id.* (citing *Ex parte Diversey Corp.*, 742 So. 2d at 1254).

The record makes clear that Plaintiff's claim is not too speculative as a matter of Alabama law and that her theory that Rodgers accidentally connected the air hose to the Extender is a "reasonable inference" deducible from the evidence. As recognized by Defendant's expert, it is undisputed connecting the air hose to the Extender is what caused the propeller to turn. Doc. 48-11 at 17. The only dispute is whether Rodgers put compressed air directly into the cylinder accidentally *or* intentionally with a different purpose in mind. Defendant states it is "hotly disputed what test [Rodgers] was going to perform next and completely unknown what he intended to do next," Resp. Br. at 21, but we are unpersuaded. Rodgers was mostly likely attempting to perform a compression test. He told Wallace and Findley he was performing a compression test. He performed a

15

compression test on the right cylinders.  He brought all the tools necessary to perform a compression test to the left side of the engine.  He attached the Extender—which only safe use is for a compression test—to the left-front cylinder. What else was he doing but attempting to perform a compression test?

Defendant suggests Rodgers intentionally inserted the air hose directly into the cylinder in an attempt "to listen for the sound of leaking air through an engine valve or around a piston ring."  Resp. Br. at 34.  In support, Defendant cites an FAA handbook, which suggests "listening for air leakage at the exhaust outlet." Doc. 45-11 at 4.  Defendant conveniently ignores that the handbook suggests doing so "*during the compression check*," meaning this listening check requires listening while the Tester is in use and in no way contemplates inserting an air hose directly to a cylinder.  *Id.* (emphasis added).  Further, Defendant's own expert testified he knew of no "written procedure or recommended process" that would require a mechanic to "connect an unrestricted compressor hose with at least 90 psi going through it directly to an aircraft engine."  Doc. 48-10 at 20–21.  The evidence before us shows that *Defendant's* theory that Rodgers was performing "another test or procedure" is in itself speculative.

A jury could reasonably conclude that Rodgers, having stated he was performing a compression test and set up to perform such a test, accidentally inserted air into the cylinder in an attempt to perform the compression test.  As the

district court summed up well at the summary judgment hearing, "*we all know he must have thought he attached the tester* because otherwise it would be suicide to do what he did. And we have no reason to think he was trying to kill himself." Doc. 77 at 90 (emphasis added).[6]

Lack of speculation, however, does not necessarily entitle Plaintiff to a finding of proximate cause in her favor. Plaintiff still bears the burden to present "substantial evidence of proximate cause." *Morguson v. 3M Co.*, 857 So. 2d 796, 800 (Ala. 2003). "Proximate cause is an act or omission that in a natural and continuous sequence, unbroken by any new and independent causes, produces an injury or harm and without which the injury or harm would not occur." *Id.* (quoting *Dillard v. Pittway Corp.*, 719 So. 2d 188, 192 (Ala. 1998)). "Foreseeability is the cornerstone of proximate cause." *Dillard*, 719 So. 2d at 192. The Supreme Court of Alabama has repeatedly stated "it is well established that the question of proximate cause is almost always a question of fact to be determined by the jury, and that the question must go to the jury if reasonable inferences from the evidence support the plaintiff's evidence." *Lemond Constr. Co. v. Wheeler*, 669 So. 2d 855, 862 (Ala. 1995) (citing *Garner v. Covington Cty.*,

---

[6] Accordingly, Plaintiff's expert witnesses' opinions regarding causation are not too speculative to be considered. We therefore, in accordance with the district court's order denying Defendant's motion to preclude, consider them in this proximate cause analysis.

17

624 So. 2d 1346 (Ala. 1993); *Marshall Cty. v. Uptain*, 409 So. 2d 423 (Ala. 1981)).

Defendant argues that the defective design of the Tester could not be the proximate cause of Rodgers's injury because the Tester was not being used when the accident occurred.  The Supreme Court of Alabama, however, has never held that "use" of a product is a requirement of the AEMLD, breach of warranty, or negligence or wantonness claims.  The Supreme Court of Alabama has explicitly stated "proof that a product was used as intended is not an element of a prima facie case under the AEMLD."[7]  *Sears, Roebuck & Co. v. Harris*, 630 So. 2d 1018, 1028 (Ala. 1993); *see also* 2 Ala. Pattern Jury Instr. Civ. 32.07 (3d ed. 2018).  *Id.* Instead, under the AEMLD, a plaintiff must show:

> (1) he suffered injury or damages to himself or his property by one who sells a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer, if
>
> (a) the seller is engaged in the business of selling such a product, and
>
> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it [was] sold."

*Morguson*, 857 So. 2d at 800 (quoting *Yamaha Motor Co. v. Thorton*, 579 So. 2d 619, 621 (Ala. 1991)).  That is, the defective condition of a product, not use of a product, must cause the injury.  *See* 2 Ala. Pattern Jury Instr. Civ. 32.07 (3d ed.

---

[7] Rather, "a user's misuse of an allegedly defective product is an affirmative defense under the AEMLD."  *Sears, Roebuck & Co.*, 630 So. 2d at 1028.

2018) (stating the causation element as follows: "(Name of plaintiff/name of deceased) was caused (harm/death) by *the defect* in the (name the product)" (emphasis added)).

The bizarre circumstances in *Bell v. T.R. Miller Mill Co.*, 768 So. 2d 953 (Ala. 2000), illustrate that a plaintiff need not be using a product for the product's alleged defect to cause an injury.  In *Bell*, while a man went inside a convenience store, his parked car rolled across a road into a guy-wire attached to a telephone pole.  The telephone pole somehow broke, causing the telephone lines to sag approximately nine and a half feet over a highway.  A recreational vehicle driving on the highway struck the line, and the line looped over and behind the vehicle.  At this point, the line sagged even lower to approximately one foot above the highway.  Then, the plaintiff's car struck the line, which lifted her car into the air and turned it upside down.  The plaintiff's daughter died from this accident.  The plaintiff brought AEMLD and negligence or wantonness claims against the telephone pole manufacturer.  After the close of the plaintiff's case, the trial court granted a directed verdict for the defendant.  On appeal, the Supreme Court of Alabama reversed, holding the trial court erred in removing the AEMLD and negligence claims from the jury.  The court held the plaintiff produced substantial evidence that created a factual question to be determined by the jury, namely whether a design defect or the negligence in manufacturing the pole proximately

19

caused the plaintiff's child's death.  The court noted that the defendant still had an opportunity to prove its affirmative defenses of lack of causation and intervening cause to a jury.

Consistent with Alabama's requirements for AEMLD and negligence claims, the *Bell* court focused on whether a jury could find that a design defect or manufacturer's negligence caused an injury, not on whether Plaintiff was using the telephone pole.  Accordingly, we decline to impose an additional "use" requirement that the Supreme Court of Alabama has not imposed upon plaintiffs and instead remain focused on whether a reasonable jury could find the alleged defective condition, the Tester's output coupling size, proximately caused Rodgers's injury.

As Defendant's expert acknowledges, had the Tester's output had a larger coupling size, which would necessarily require a larger coupling size on the Extender's input, this injury would not have occurred.[8]  Doc 48-10 at 29 (Lykins acknowledging the alternative design would have prevented Rodgers from connecting the air hose to the Extender).  Further, the record reveals evidence from which a reasonable jury could conclude such an injury was foreseeable.  First, a 2006 article from an online aviation website shared the following safety tip from

---

[8] Again, let us emphasize the Tester hose's coupling size dictates the Extender's input coupling size, for the Extender's purpose is to facilitate a compression test.

20

an airframe shop manager: "We installed unique couplings on our compression test adapter. They are different from the couplings on all our air hoses. That way, it is virtually impossible to connect it to un-regulated shop air."  Doc. 48-16 at 61. Second, Dr. Maddox, Plaintiff's human error expert witness, testified: "Even a cursory examination of potential human errors in the use of the tester and extension would identify the admission of unregulated, high-pressure air into the cylinder under test as a critical error, in that it could lead to immediate injury to anyone in the vicinity of the prop."  Doc. 49-7 at 10.  Third, Matthew Lykins, Defendant's expert witness, stated he had heard discussions about the potential for mechanics to accidentally put shop air directly into a cylinder while intending to connect the Tester, although he had never heard of such incident actually occurring.  Doc. 48-10 at 27.  This evidence indicates at least some people in the industry knew the standard design of differential pressure testers and pressure tester extensions allowed air to be inserted directly into the engine cylinder and that such a connection could result in serious injury.

Mindful that "the question of proximate cause is almost always a question of fact to be determined by the jury," *Lemond Constr. Co.*, 669 So. 2d at 862, we conclude, under Alabama law, the foregoing is "substantial evidence" by which a reasonable jury could find the Tester's design proximately caused Rodgers's injury and that such an injury was foreseeable.  We decline to decide Defendant's

alternative arguments, including arguments based on its affirmative defenses, that the district court did not reach.  Neither do we, in this narrow holding, opine as to the other elements of Plaintiff's claims.  The district court's grant of summary judgment is REVERSED and REMANDED for further proceedings consistent with this opinion.