ALMON, Justice.
The defendants — Margaret C. Prestwood, as executrix of the estate of James M. Prest-wood, deceased; Snead-Kennedy, Inc.; and Mississippi Valley Title Insurance Company — appeal from a judgment for the plaintiff, the City of Andalusia. The city alleged fraud and sought: rescission of a deed of March 7, 1990, in which Snead-Kennedy is the grantor and the city is the grantee; damages equal to attorney fees and expenses incurred in regard to the real estate transaction in which the deed was given; punitive damages; and interest. The circuit court granted all relief requested, ordering (1) that the deed be rescinded; (2) that Snead-Kennedy refund the $629,996.64 that had been paid toward the purchase price, plus interest; (3) that the promissory note for the balance due be can-celled; (4) that judgment be entered against Prestwood and Snead-Kennedy for $629,-996.64, with any refund by Snead-Kennedy to be credited against that judgment; and (5) that the plaintiff recover from the defendants $100,000, of which $65,532.55 was awarded as attorney fees and interest.
In 1989, James Prestwood, while serving as president of Snead-Kennedy, was approached by Ed Short, the chairman of the Industrial Committee for the Andalusia Area Chamber of Commerce, to discuss the purchase of a certain tract of land owned by Snead-Kennedy. At that time, the land was not on the market. The city wanted to pur *1174 chase the property to develop an industrial park. Weeks of negotiations between James Prestwood and Short followed, during which time Snead-Kennedy granted the city permission to survey, examine, and inspect the property.
On December 15, 1989, Snead-Kennedy granted the city an option to purchase the property for a price of $1 million. The option was to expire 90 days after the date of execution. Mayor Benny Barrow, acting for the city, acknowledged receipt of the option on December 26, 1989. Barrow telephoned James Prestwood on February 26, 1990, and notified him that the city had elected to exercise the option. This was confirmed in a letter from James Prestwood to Barrow dated February 28, 1990.
A closing was held on March 7, 1990, and was attended by James Prestwood; Mayor Barrow; Sid Fuller, the Andalusia city attorney; [1] and Tom Lane, president of Covington County Bank. At the closing, Snead-Kennedy executed a warranty deed conveying the property to the city. The city paid $100,000 as a down payment and executed a promissory note to Snead-Kennedy for $900,000, the balance of the purchase price. No title search had been done by the city at this time. Sid Fuller testified to the following exchange:
“Mr. Prestwood said, when I asked about title, who was going to certify title, he just said that the title was good and that he would furnish title insurance.”
This is the alleged fraud on which the City bases its claims for rescission and damages.
Two weeks after the closing, the city received a title insurance policy from Mississippi Valley Title Insurance Company dated March 13, 1990, with a face amount of $1 million.
On August 28, 1991, Sid Fuller wrote a letter to Mississippi Valley, stating that the city had been notified that the Industrial Development Board had been advised that title to the property was defective and that the city was conducting an independent title search regarding the property.
We will discuss the facts surrounding the alleged defects in more detail below, but we will summarize the principal ones here for the reader’s benefit. This land had been owned by Ara Henderson, who died intestate in 1965. Each of her heirs conveyed his or her interest in Ara Henderson’s estate to Johnny Smith. The final decree in the probate of her estate declared Johnny Smith to be the sole owner, in fee simple, of all of Ara Henderson’s property, real and personal. Through mesne conveyances, Johnny Smith conveyed the land in question to Snead-Kennedy. The city contends that the title is defective because, it says, the probate record does not clearly indicate all the heirs of Mrs. Henderson and the descriptions in the deeds are vague and do not particularly describe ■the land in question. The defendants responded by presenting evidence that the alleged uncertainties had been clarified by affidavits and corrective deeds. The record contains nothing to indicate that any person or party could assert a claim to the land adverse to that of the city, and no person has made any such claim.
In the fall of 1991, Sid Fuller and Tom Marvin, vice president and claims counsel of Mississippi Valley, exchanged letters regarding the coverage of the title policy. They held a conference on December 4, 1991, to discuss the city’s concerns and the course of action to be taken. This resulted in the issuance of a replacement policy on April 1, 1992, that insured the marketability of the title and dated back to the issuance of the original policy on March 13,1990.
On July 28, 1992, the city wrote the defendants, requesting that the transaction be can-celled, and stating that if that was not done within two weeks a lawsuit would be filed. The defendants did not agree to the cancellation. On August 12, 1992, the city filed a complaint alleging that it was fraudulently induced into completing the transaction by James Prestwood’s statement at the closing that “title is good.” Snead-Kennedy and Mississippi Valley were included as defendants under the theory that James Prest- *1175 wood was acting as agent for each of them when he made the statement.
A nonjury trial began on October 16,1995. After the completion of the trial, the city was granted leave to amend its complaint. The amended complaint included four new theories: 1) that the obligation to provide “clear title” contained in the option agreement was breached; 2) that each defendant had had a duty to disclose to the city that the title to the property was not marketable because of defects in the title, and that each defendant had suppressed that information; B) that the defendants were negligent in that they owed a duty to the city to discover and disclose to the city that the title was defective and was not marketable, and that they failed to do so; and 4) that the defendant Snead-Kennedy breached its “covenant or agreement” (i.e., the warranty of title) contained in the warranty deed executed on March 7, 1990, in that Snead-Kennedy was not lawfully seized in fee simple of the property, the property was not free from all encumbrances, and Snead-Kennedy did not have a right to sell and convey the property.[2]
The principal basis for' relief was the allegation of fraud in the original complaint. For a plaintiff to recover in a fraud action, there must be proof (1) that the defendant made a false representation; (2) that the false representation concerned a material fact; (3) that the plaintiff relied upon the false representation; and (4) that the plaintiff was damaged as a proximate result of the reliance. Harrington v. Johnson-Rast & Hays Co., 577 So.2d 437 (Ala.1991); see also Ala.Code 1975, § 6-5-101.
The city did not present substantial evidence that James Prestwood’s statement — “title is good” — was a misrepresentation. A false statement is an essential element of fraud. This Court has held that “there can be no liability for fraud without proof that the defendant made an untrue statement.” Keller v. Security Federal Sav. & Loan Ass’n, 555 So.2d 151, 155 (Ala.1989)(citing Pugh v. Kaiser Aluminum & Chemical Sales, Inc., 369 So.2d 796 (Ala. 1979), and International Resorts, Inc. v. Lambert, 350 So.2d 391 (Ala.1977)). Not one witness testifying at trial, including the city’s own experts, could testify that title to the property was not good.
Mark Murphy is the person who initially suggested that there were “defects” in the title.' Murphy was asked by Earl Johnson, chairman of the Industrial Development Board, to look into the matter. Murphy gave the following testimony on cross-examination by Ben Fuller, counsel for Mississippi Valley:
“A.... My problem is this, I didn’t say and have never said that the title is bad title as far as title not being held....
“Q. So you are not up to telling the court today that the city doesn’t hold good title to that property?
“A. No, sir. I don’t have that information. I cannot tell the court that the city has bad title. I have never made that representation....
[[Image here]]
“Q. In fact the only evidence you have seen, the only documented evidence that you have seen, tells you that the City of Andalusia has title to this property, doesn’t it? That is the only evidence you have seen of title to this property as we sit here today?
“A. Again, my statement is that I have not seen anything which indicates that the city has bad title.... ”
On cross-examination by Alvin Prestwood, counsel for the defendants James Prestwood and Snead-Kennedy, Murphy testified as follows:
“Q. But you have testified several times today, as you did at your deposition, twice, that title to this property that is in question today made in the City of Andalusia may very well be good title?
“A Yes, sir, I have stated that several times.
“Q. And you still stick by that today?
“A. There is a pronounced difference between marketable title and defective title and good title. You can have a defec *1176 tive title which is in fact good from that of nobody having better title.
[[Image here]]
“Q. If [James Prestwood] said there was a good title you couldn’t say that was untrue, could you?
“A. No, sir. I couldn’t say that it wasn’t good title....
[[Image here]]
“Q. My question, and let’s do it two ways, if he said the title was good or that there was good title to this property, could you say under oath today, that those statements, if they were made by Mr. James Prestwood, were untrue?
“A. As I was attempting to explain, no, I could not say that the title was bad. No, I could not say that it would be telling you an untruth if he said that he had good title.
[[Image here]]
“Q. Now if I tell you, Mr. Murphy, sitting here today, that there is good title to this property in the City of Andalusia, can you say under oath that I am lying, or I am not telling the truth?
“A. I cannot say under oath that the city does not have good title. I have said that several times.
“Q. And if I told you that the title was good, could you say under oath that I am not telling you the truth?
“A. If you are just talking about whether or not the city has good title, I cannot say that you are not telling the truth if you are using the term ‘good’ to mean what I think you are meaning....
[[Image here]]
“Q. So you can have a set of facts that would result in title being good in one situation — ■
“A. Yes, sir.
“Q. —where the record doesn’t reflect it?
“A. Yes, sir. That is the distinction between marketable title and good title. You can have good title where the facts, once they are analyzed and once you find them out, would give you good title. But the record doesn’t reflect those facts.
“Q. That is when you need to plug that record with those facts?
“A. Yes, sir.
“Q. So if I had knowledge of a situation involving the title to property, if I had personal knowledge of who was who and who was kin to whom, and such things as that, and who had possession for a long time, and I said to you ‘Title is good,’ that might be true, that title is good, but the record might not reflect it at that time, is that true?
“A. That’s correct.”
(Emphasis added.)
The city hired James Johnston to do an independent title search after the city had been told that the title was defective. Johnston was asked on the witness stand whether title may be absolutely good in the City of Andalusia. His response was that “it may be.”
Barrow, who was mayor of the city during the course of the transaction, gave similar testimony on the truthfulness of James Prestwood’s statement:
“Q.... Mayor, what I am asking you is, if you know, to tell me somebody that says, ‘Hey, I own this property. The city doesn’t own this property.’ Who is saying that?
“A. I know of no one.
“Q. Nobody is saying that?
“A. No.
“Q. So there is no adverse claim to the city as far as you know, is that right?
“A. As far as I know.
[[Image here]]
“Q. So it is just your testimony that you don’t know whether the title is good or not, from personal knowledge?
“A. No, sir, I do not.
“Q. As far as you know, it could be as good as gold from your personal knowledge?
“A. Absolutely.”
Sid Fuller, the city attorney, testified:
“Q_ lam asking you: Can you testify that the City of Andalusia does not have a good title to this property?
*1177 “A. That is outside my field. I don’t know, sir.
[[Image here]]
“Q. Do you have any personal knowledge as to whether this title is good or bad, substantively good or bad?
“A. Just based on the reports of the people that checked the title. I never checked this title or attempted to check it....”
For James Prestwood to be found guilty of fraud, the plaintiff must prove that his statement was false. He must have made a misrepresentation. A factfinder could not reasonably find that he made a misrepresentation, when not one witness could say under oath that the statement was untrue. If, after all the searches and examination of, and concerning, this title, no one could say that title was not good, then the city did not produce substantial evidence that it was fraudulent for James Prestwood to say that title was good.
In Meeks v. Garner, 93 Ala. 17, 8 So. 378 (1890), this Court affirmed the dismissal of a bill for rescission of a deed under facts that were very similar to the facts in this ease. Meeks involved the sale of a tract of land that was purchased for the purpose of dividing and selling it out in town lots; the purchaser alleged that he had been prevented from carrying out his purpose by an incum-brance on the title. The prayer for a rescission of the sale was based on allegations of fraudulent representations by the vendor as to the nature and quality of his title to the land, whereby the purchaser was induced to enter into the contract, and allegations that the vendor’s title was defective at the time of the sale. The representations relied upon were, among other things, “that his title to said property was perfect and good” and “that the title had always been in him, and that he had always refused to sell it.” 93 Ala. at 20, 8 So. at 378.
As showing the falsity and fraud of these representations, the plaintiff alleged that the vendor had deeded the same land to the vendor’s son-in-law some 17 years before the sale to the plaintiff and that the son-in-law had lately had the conveyance recorded and had brought an action at law against the plaintiff to recover possession of the land. The vendor filed an answer admitting that he knew at the time of the sale that he had at one time executed a deed purporting to convey the land to his son-in-law, but denied that it had any legal effect. He further alleged that the deed had not been recorded until after the sale to the plaintiff; that he had always remained in possession of the land, under claim of ownership; and that the action brought by the son-in-law had been dismissed.
The Court, in affirming the circuit court’s holding that these facts did not amount to fraud, held:
“All the authorities hold that the false and fraudulent misrepresentations must be of ‘material,’ ‘substantial’ facts, and damage must have resulted from the fraud.... As against the title of the purchaser, the deed was wholly inoperative.
“... Under such a state of facts, [the vendor’s] title in law was perfect as against any claim by [his son-in-law], and sueh was the title conveyed by him to his vendees.
“... Whether he ‘had always owned the lands, and had never parted with them,’ was true or not, did not and could not have in any manner made his title the less perfect. A material inquiry is, was the title free from ‘grave doubts’? ... Did the title fully protect the purchaser in the property conveyed? ...
“A vendor can not be held responsible for a fraudulent misrepresentation as to his title, simply because third parties engage in blackmailing or malicious litigation with his vendee, or because others, not competent to judge of the title, refuse to purchase from the vendee.”
Meeks, 93 Ala. at 21-22, 8 So. at 379.
The alleged defects in the present case are no more a basis for a fraud claim than those alleged in Meeks, because the city has not shown that its title is any less perfect or “good” because of them. In Meeks, not only was there another conveyance of the same land, and, thus, a subsequent adverse claim by a third party, but also the vendor admitted that he knew of the defect when he made the statement. No such adverse claim has *1178 been shown here. There is no evidence of any third party who could make an adverse claim against title to this property, and there has been no showing that James Prestwood knew of any defect that could have rendered his statement untrue. Applying the “material inquiries” discussed in Meeks to the title in this case, we do not find substantial evidence that James Prestwood committed a fraud.
The city admitted in its brief to this Court that it holds “record title.” There is no evidence that any prospective purchaser decided not to buy because of the alleged defects. There is no evidence of an adverse claim against this property by a third party. Further, there is no evidence of even the existence of a third party who could possibly have standing to bring a claim against this property. Murphy testified that potential claims by third parties are what title examiners look for: “Basically you are trying to ensure when you check a title that there is nobody out there that can claim an interest in the real estate that you are examining other than the person that you certify.” Here, the city itself, rather than a third party, has undertaken to attack its own title.
There was no fraudulent misrepresentation of “material,” “substantial” facts, as required for a finding of fraud. The city has attempted to take every minute, immaterial imperfection in the record of title to this property and turn it into a defect so great as to render James Prestwood’s representations false. The city has done this without having suffered any adverse claims against its title, without having filed a claim under its title insurance policy, and before even attempting to sell any portion of the land.
In Messer-Johnson Realty Co. v. Security Savings & Loan Co., 208 Ala. 541, 94 So. 734 (1922), iri determining whether a title was good and merchantable, notwithstanding defects in the record of title, the Court stated:
“ ‘The rule that the title must be free from reasonable doubt does not require a title absolutely free from all suspicion or possible defect, but only requires a title which a reasonable purchaser, well informed as to the facts and their legal bearings, willing and anxious to perform his contract, would, in the exercise of that prudence which business men ordinarily bring to bear upon such transactions, be willing to accept and ought to accept.... In the absence of an express stipulation therefor, a marketable title does not mean a title which satisfies the purchaser, or which his attorney pronounces marketable.’ ”
208 Ala. at 543, 94 So. at 735 (quoting 39 Cyc. 1450(c); emphasis added).
Whether a title is marketable or not is a matter of opinion. Johnston and Murphy each admitted that some lawyers would pass on title that they would not. Simply because the city asserts that this title is unmarketable does not make it so. Murphy testified that “most titles have some sort of defect” and that “it is not unusual to have to cure defects” (emphasis added). He further testified that “there are a lot of defects that you can live with” and that “you can always fix a problem.” To find James Prestwood guilty of fraud because of minor, curable imperfections in this title that are of the same sort that appear in most titles would be to impose too high a standard. It was a strained inference, at best, to find, based on his statement — “Title is good” — that the parties intended, and the city relied on, a conveyance of a title free of even common imperfections that have no legal bearing on the title itself.
Moreover, the defects or imperfections in the record title that the city did allege were cured before trial by corrective deeds and affidavits.
“Upon a bill filed by a vendee for the rescission of an executed ... agreement for the sale of land, because of a defect in the title, no fraud having been practiced by the vendor, it will be a sufficient answer if the vendor can show that he had a valid and legal title at the time it was agreed the title should be made, or at the hearing of the cause, although the title may have been defective at the date of the agreement. ...”
Meeks, 93 Ala. at 21, 8 So. at 379 (emphasis added).
Specifically, the city contends that its main concerns were with the following alleged defects:
*1179 The city takes issue with the fact that at the time of the conveyance to it, there was not an affidavit in the land-title records that listed the heirs of Mrs. Henderson. There is no merit to this argument, for several reasons. First, the heirs of Mrs. Henderson were listed in the petition for letters of administration of her estate, and that petition was included in the city’s abstract of title.[3] Second, any defect that this might have constituted has been cured by an affidavit of heirship that was recorded on February 19, 1992, before the trial.[4] Third, by the time of the trial, three lists of heirs had been separately prepared by different sources — James Johnston, an expert for the plaintiff; Larry Putt, an expert for the defendants; and He-lon Gantt, James Prestwood’s secretary, who prepared an affidavit verifying the heirs listed in the petition for letters of administration of the estate of Ara A. Henderson. All three lists named the same heirs. “ ‘A title is not necessarily rendered unmarketable because it is dependent on the proof of a fact not of record, if there is no reasonable doubt as to how the fact is and the proof is readily accessible at any time to show how it is.’ ” Messer-Johnson Realty Co., 208 Ala. at 543, 94 So. at 735 (quoting 27 R.C.L. 493, § 211). The fact that these lists were identical shows that there is no reasonable doubt as to “how the fact is” and that proof of the pertinent facts was readily available.
The city also took issue with the language of several deeds in the chain of title. It never alleged that these deeds failed to convey title to the property to subsequent purchasers, but rather alleged that the descriptions contained in those deeds did not enable the reader to go out and “find the land on the ground.” Principally, the city and its experts alleged that they were concerned with the deeds that each of Mrs. Henderson’s heirs executed to Johnny Smith. Each deed contained language to this effect: “I convey all my right, title, and interest in all property, real or personal, owned by Ara S. Henderson at the time of her death, wheresoever located.” This Court upheld a deed containing this very kind of description in Glover v. Webb, 205 Ala. 551, 88 So. 675 (1921). Furthermore, Mr. Jesse Evans, an expert witness for the defendants, testified that the land conveyed by these deeds could easily be ascertained by doing a search for all property owned by Mrs. Henderson at her death. Moreover, the final decree in the probate of Mrs. Henderson’s estate declared that title to all of Mrs. Henderson’s property was vested in Johnny Smith. The city’s assertion that it is concerned as to the effect of these descriptions does not raise a reasonable doubt as to its title to the property.
The city further alleged that certain deeds conveying the property after Smith owned it, but before the city owned it, contained vague descriptions. We hold that the descriptions in these deeds raised no valid concerns and that even if such concerns did exist they were cured by the filing of corrective deeds on March 20, 1991, before Johnston’s abstract was completed and before trial.
As we have shown above, the alleged defects do not raise a substantial doubt regarding the city’s title to the property, and they certainly do not show that any adverse claim can be asserted against the city’s title. The city’s claim for relief is further weakened by its lack of diligence before the closing.
“[B]y inquiry, [the city] could have ascertained [the title’s] condition; [its] failure to do so, is chargeable only on [itself], and is a want of that common or ordinary diligence, which a Court of Chancery always requires, in cases like the present, before its aid can be obtained.”
Steele v. Kinkle, 3 Ala. 352, 358 (1842), overruled on other grounds, Adams v. Thornton, 78 Ala. 489, 492 (1885). There was no showing that James Prestwood prevented the city from inspecting the title; as we have held above, his bare statement at the closing that *1180 title was .good was not a fraudulent misrepresentation that would excuse the city from any duty to ascertain the title’s condition before completing its contract to purchase the property.
Had the city been sincerely concerned with these alleged defects in its title and eager to cure them, it could have filed a claim under its title insurance policy. The city filed no claim under that policy. It chose instead to attempt to portray James Prestwood’s statements as fraud, in order to provide itself with a basis for rescinding the transaction. The city hardly qualifies as a “reasonable purchaser ... willing and anxious to perform his contract.” Messer-Johnson Realty Co., supra, 208 Ala. at 543, 94 So. at 735.
The record also contains evidence tending to show that in completing the transaction the city did not rely solely on James Prest-wood’s statement regarding the state of the title, but rather that it relied on an understanding that it would receive either good title or a title insurance policy. Sid Fuller, the city attorney, to whom James Prestwood made the statements, testified:
“Q. Did you rely on what Mr. [James] Prestwood told you that the title was good?
“A. That and his promise to getting me title insurance.
“Q. Did you rely on him getting you title insurance?
“A. Yes, sir.
[[Image here]]
“A. Mr. [James] Prestwood, under the deal, was going to supply the good title and the proof of it or the insurance to stand for the proof of it.... In the nature of prudence it was a mistake not to check the title independently], but under the terms of the deal Mr. Prestwood was to furnish the good title, the certification of the title, or the insurance that would stand in the place of it.... So, it is really not a mistake to take title insurance in lieu of a title search, because you are supposed to get a little bit more. So when Mr. Prest-wood — I said, ‘Who is going to certify the title?’ — he said, ‘We are going to furnish insurance.’ Well, that was okay because that is really better than a certification by a local counsel.”
(Emphasis added.)
We find in the record no substantial evidence to support the trial court’s finding of fraud. We have studied the claims asserted in the amended complaint; even assuming that the amendment was properly allowed (see footnote 2), we find no merit in those claims, which, like the fraud claim, depend upon the unproven assertion that Snead-Kennedy did not convey good title. Therefore, it was error for the circuit court to set aside the deed. Because the other relief awarded was dependent upon factual findings that were contrary to the evidence, the judgment is set aside in its entirety.
For the reasons stated, the judgment is reversed, and the cause is remanded.
REVERSED AND REMANDED.
HOOPER, C.J., and MADDOX, SHORES, HOUSTON, KENNEDY, and COOK, JJ., concur.
SEE, J., concurs in the result.

. The City did not request Sid Fuller to conduct a title search or to give a title opinion. He was not informed about the transaction until after the mayor had exercised the option on February 26.

. There is some question whether this amendment was properly allowed. In light of our disposition of the principal issue, we need not decide this question.

. The city attempts to call this list incomplete because the two children of Hugh L. Prestwood are not included. However, Hugh Prestwood was still living at the time this list was compiled. His children would not have inherited from Mrs. Henderson and, thus, would not have been included in the list of her heirs.

. This affidavit of heirship was recorded before Johnston completed his search and, he testified, he missed it.